CHAMBERLAYNE SCHOOL AND CHAMBERLAYNE JUNIOR COLLEGE[1] *vs.* ROBERT BANKER, individually and as trustee, & others.[2]

No. 89-P-912.

Suffolk. December 4, 1990. - March 27, 1991.

Present: DREBEN, FINE, & JACOBS, JJ.

*Consumer Protection Act*, Unfair act or practice, Businessman's claim, Damages. *Deceit. Practice, Civil*, Consumer protection case. *Damages*, Consumer protection case.

At the combined trial of a businessman's claim under G. L. c. 93A and a common law claim of misrepresentation, the judge proceeded correctly in making his own finding of damages on the G. L. c. 93A claim, including doubling that amount and awarding attorney's fees, independently of the jury's finding of damages on the claim of misrepresentation. [353-355]

On a businessman's claim under G. L. c. 93A, the Consumer Protection Act, the judge appropriately awarded damages measured by the benefit to the plaintiff of an agreement whereby the defendants were to acquire the plaintiff's first refusal rights to purchase certain real property, where the judge was warranted in finding that the defendants never intended to perform the agreement and engaged in deceptive stalling tactics, resulting in the plaintiff's being unable to exercise its rights; moreover, the judge properly awarded double damages based on wilfulness of the defendants' actions. [355]

CIVIL ACTION commenced in the Superior Court Department on February 1, 1982.

The case was tried before *John Paul Sullivan, J.*

*Gordon T. Walker* for the defendants.

*John S. Leonard* for the plaintiff.

---

[1] The school and the junior college are herein referred to as Chamberlayne.

[2] Alan E. Lewis and Steven B. Belkin, in addition to Banker, were sued as trustees of Kensington Realty Trust and as partners of Kensington Associates.

DREBEN, J. May a judge, after a jury has found the plaintiff's damages to be $20,000 because of the defendants' misrepresentations, find damages in the amount of $60,000 (prior to doubling) for a G. L. c. 93A violation based, in the words of the trial judge, on "the same fact pattern" which was before the jury? Our answer is "yes," and we affirm the judgment.

Although the defendants do not agree with the trial judge's findings of fact, they do not urge that his findings are clearly erroneous. A review of the record indicates that they are amply supported, and, since his findings ably depict what happened, we set them forth in their entirety.

"On February 20, 1979, Chamberlayne entered into a lease with Massbury Realty Company to rent the second floor of a building located at 92-100 Massachusetts Avenue, Boston, Massachusetts. Section 9.2 of the Lease granted Chamberlayne the right of first refusal to purchase the premises at any time during the term or any extension thereof. This right of first refusal required Massbury, if it wished to sell the premises, to submit a signed purchase and sale agreement to Chamberlayne, and gave Chamberlayne ten days to accept the agreement. If Chamberlayne did not accept it within that time, Massbury was free to sell the premises upon the same terms and conditions and at the same price set forth in the agreement submitted.

"On July 30, 1981, Massbury advised Chamberlayne by letter delivered to Owen Todd, a Trustee and legal counsel for Chamberlayne, that it had entered into a Purchase and Sale Agreement to sell the premises to the Holmes Real Estate Trust, and attached to its letter a copy of its Purchase and Sale Agreement with Holmes. The purchase price for the Premises under this Agreement was $1,160,000.00.

"That same day, July 30, Todd was contacted by Attorney Alan Stanzler of the law firm of Linsky, Finnegan and Stanzler, who said he had a party who was interested in acquiring Chamberlayne's right of first refusal for the premises. On Monday, August 3, 1981, Todd was contacted by the defendant, Robert Banker who indicated that he was involved with a group that wished to buy the premises; that he knew someone had made an offer to buy the premises from the owner and that Chamberlayne had a right of first refusal under its Lease; and that he would like to meet with Todd to talk about buying the right of first refusal from Chamberlayne. That same day, Todd met with Banker and Attorney Paul Finnegan of Linsky, Finnegan and Stanzler, who was representing Banker and his group. At the meeting, Banker again stated that he, and two others whom he represented, wanted to buy the premises, and wanted to use Chamberlayne's

right of first refusal in order to buy it. Banker was acting on behalf of an entity known as Kensington Realty Trust and persons with an ownership interest in that Trust: Steven Belkin, Alan Lewis and himself. Belkin and Lewis were Banker's partners with respect to the potential acquisition of the premises and Banker was acting as a representative and agent of Belkin and Lewis in his negotiations with Chamberlayne and Todd. Todd told Banker that Chamberlayne would be interested in selling its right of first refusal.

"Neither party wished to make the first offer, and Todd suggested that they both put their figures on pieces of paper and show one another what their figures were. Both wrote their numbers down, and Banker's piece of paper said $50,000.00 while Todd's said 20% of the purchase price. Banker stated he thought that Todd's figure was too high, and they left the meeting agreeing that both would think about it further.

"Todd, Banker and Finnegan next met on Wednesday, August 5. Banker stated at this time that he had the authority to increase the offer of his group to $60,000.00. Todd responded that he thought that 10% of the purchase price ($116,000.00) was a reasonable figure. At that time, they could not agree, and Banker stated he would discuss it further with his partners. Todd stated he was going to contact the person that had made the offer to buy the building from Massbury to see if they were interested in buying Chamberlayne's position.

"On the next day, Thursday, August 6, 1981, Todd telephoned Stuart Pratt, one of the trustees of Holmes. He told Pratt that he had been contacted by someone who was interested in buying Chamberlayne's right of first refusal and asked whether Pratt's group was interested. Todd told Pratt that Chamberlayne was asking 10% of the purchase price for the property as the price for its right. Pratt indicated an interest in discussing the matter further. Pratt asked the identity of the other party with whom Todd was negotiating, and the amount which had been offered, and asked for a copy of the offer. Todd responded that he did not have authority to reveal the identity of the other party.

"After speaking with Pratt on August 6, Todd received a call from Attorney Timothy Jaroch of Goodwin, Procter & Hoar, attorney for Holmes. Jaroch asked Todd how he thought the transfer of Chamberlayne's rights to another party could be effected, indicating that he did not think Chamberlayne had the right to transfer its right of first refusal or its rights under the lease. Todd disagreed. Thereafter, Attorney Jaroch again called Todd and stated that his clients would like to meet with Todd about the matter or get back to Todd the next day, Friday.

"After the foregoing conversations, Todd received a call from Banker. Banker asked him whether he had contacted the group which had signed the agreement to buy the premises, and Todd said that he had and that they were going to meet to discuss it further. Banker stated that he had been discussing the matter with his partners and was taking the position

that the offer which he had given Todd was to be accepted or rejected and that Chamberlayne should not continue to negotiate the sale of its rights to anyone else, or Kensington's offer would be rescinded. In short, Banker told Todd that unless he accepted the offer then and there, it was rescinded. After thinking about the matter for a brief period, Todd indicated to Banker that they had 'a deal.'

"The basic elements of the agreement reached by Banker and Todd in this telephone conversation on Thursday, August 6, were that (1) Banker and his partners would pay Chamberlayne $60,000.00 for its right of first refusal; (2) Chamberlayne would keep the $60,000.00 irrespective of what happened in Kensington's negotiations to buy the building, and irrespective of whether Kensington's deal to buy the building thereafter went or fell through; and (3) Banker and his partners would indemnify Chamberlayne against any claims, losses or expenses arising out of the sale of the right of first refusal from Chamberlayne to Banker, and defend Chamberlayne against any suit, at Chamberlayne's option.

"An additional element of the agreement reached was that Todd would cease negotiations with Holmes or anyone else regarding the sale of Chamberlayne's right of first refusal, an element which Todd states he performed by not speaking with Pratt or Attorney Jaroch at any time on Thursday, August 6, or Friday, August 7, after reaching the agreement with the Kensington group.

"Todd and Banker did not discuss the specific mechanics of how Chamberlayne's rights were to be transferred to Kensington. It was clear to all parties, however, that Banker and his group wanted to own the building, and that Banker believed that they could do that through Chamberlayne's rights under its lease. Todd was willing on behalf of Chamberlayne, to give Banker whatever he wanted to effect his objectives, for $60,000.00 and an indemnity agreement. Accordingly, Todd and Banker agreed that Attorney Paul Finnegan, on behalf of Banker, and John Christoforo, on behalf of Chamberlayne, would proceed to work immediately on drafting the necessary documents to effect the transaction as agreed.

"Christoforo and Finnegan met at the offices of Hale & Dorr late that Thursday afternoon, August 6. At that meeting, Christoforo and Finnegan agreed at the outset that $60,000.00 was to be paid by the Kensington Group to Chamberlayne, and the only thing that had to be worked out was how Finnegan wished to implement the sale. Finnegan advised that he preferred to have Chamberlayne exercise its right of first refusal and that he would prior thereto give Chamberlayne a purchase and sale agreement to purchase the property. Christoforo told Finnegan that this proposal was fine with him. It was agreed that Christoforo would draft the agreement memorializing the responsibilities and obligations of each of the parties in relation to the exercise of the right of first refusal, and that Finnegan would draft the purchase and sale agreement. Finnegan stated that his

clients would be at Hale & Dorr first thing the next morning to execute the documents and would at that time have the $110,000.00 necessary to pay the $60,000.00 to Chamberlayne plus the $50,000.00 deposit required under the purchase and sale agreement with Massbury. Finnegan also told Christoforo that he would produce another party to assure Chamberlayne that the $410,000.00 in cash, required at the closing under the purchase and sale agreement with Massbury, would be available.

"Christoforo and Finnegan specifically discussed the expiration of the right of first refusal, and agreed that they should act on Friday to exercise the right so as to avoid its possible expiration on Sunday, August 9. Christoforo drafted an agreement that night. Early Friday morning, Christoforo and Finnegan spoke by telephone and Finnegan gave Christoforo the name of Trans National Travel, Inc., to be added as a party to the agreement for purposes of assuring that there would be sufficient funds to cover the $410,000.00 required at the closing. Christoforo redrafted the agreement to include Trans National as a party and had it delivered to Finnegan that same morning. This draft clearly set out the basic elements of the contract between the parties as follows:

1. The purchasers' payment to Chamberlayne of a $110,000.00 deposit in connection with Chamberlayne's exercise of its right of first refusal to buy the premises from Massbury;

2. $60,000.00 of that deposit was to be nonrefundable, as a payment by the purchasers to Chamberlayne for stepping into its shoes under the right of first refusal;

3. The purchasers would indemnify and hold Chamberlayne harmless from any liabilities arising out of any suit against Chamberlayne for having exercised the right of first refusal.

"Based upon his prior agreement with Finnegan, Christoforo thereafter expected Finnegan to come to Hale & Dorr with his clients on the morning of the 7th, bringing with them (a) a copy of the Agreement Christoforo had sent him (b) a Purchase and Sale Agreement that his clients had signed, and (c) 110,000.00. At that point, the documents would be signed and notice of the exercise of the right of first refusal would be given to Massbury.

"By 11:00 a.m., however, nothing had happened, and Christoforo called Finnegan's office. Finnegan told Christoforo that his clients were on their way to his office and would be over shortly, but that he had not yet received the agreement Christoforo had prepared. Christoforo said he did not understand that because he had given it to a messenger some time before. Sometime during that Friday morning, Finnegan told Christoforo not to worry, because 'we have a deal.'

"Within 5 or 10 minutes of speaking to Finnegan, Christoforo received a telephone call from Banker. Banker said he was in Cambridge and was about to leave for Finnegan's office, but that he was delayed because one of his partners, Belkin, had been on the Cape and was on his way to Cam-

bridge. Banker stated that as soon as Belkin arrived, they were going to go to Finnegan's office and then would come to Christoforo's office. Christoforo asked Banker if he had the $110,000.00, and Banker told him that Finnegan had $50,000.00 and that Banker had $60,000.00. Banker further stated that he would bring the $60,000.00 in certified funds. (In fact, during the first week of August, 1981, Finnegan had received a check from his clients in connection with the Chamberlayne matter.)

"At about 1:00 p.m., Banker again called Christoforo, stating that Finnegan was out of his office temporarily but would be back shortly, and that Belkin had been delayed but was now on his way and would be meeting up with Banker momentarily. Banker indicated that as soon as Belkin arrived, they would come to Hale & Dorr.

"Close to 3:00 p.m., Christoforo received another call from Banker, who indicated that he was at Finnegan's office, but that Belkin was having trouble getting up from Cape Cod because he was on vacation and had two small children. Nevertheless, he stated that [he] would be coming over to Christoforo's office shortly. At this point, Christoforo became disturbed with Banker, and told Banker that his group had to get over to Hale & Dorr immediately because Christoforo wanted to exercise Chamberlayne's rights that afternoon and time was running out. Banker assured Christoforo that his group would be over soon.

"At approximately 4:45 p.m., since no one had yet appeared at Hale & Dorr, Christoforo called Finnegan's office. At that time, Christoforo was told that Finnegan had left for the day and would not be back until Monday. A short time later, Christoforo received a call from Banker. Banker again stated that he had not been able to meet with Belkin because he had not arrived. Christoforo told Banker that he and Finnegan had been calling Christoforo all day telling him that they were going to come to the office of Hale & Dorr and that nothing had happened, and that now it was too late to take any action. Banker asked where Christoforo could be reached that night, but Christoforo said he did not see any point in meeting that night and said that they would have to take care of the matter on Monday.

"In fact, it is clear on the basis of the credible evidence and the reasonable inferences, therefrom, that as of Friday morning, August 7, Banker and his partners actually had no intention of meeting with Christoforo or consummating in written form, the agreement which had been reached with Chamberlayne. Specifically, while Christoforo was being given repeated assurances throughout the day that Banker's group was coming to Hale & Dorr to sign an agreement with Chamberlayne and were simply waiting for Belkin to arrive from Cape Cod, Banker's group was actually meeting first at Linsky, Finnegan & Stanzler and later at Goodwin, Procter & Hoar, to reach and consummate a deal with Holmes to purchase its rights under the purchase and sale agreement for the premises. On the basis of the credible evidence and the reasonable inferences

therefrom, the Court concludes that Chamberlayne was being stalled and deceived throughout that day as its option was running out.

"Stuart Pratt and Alan Lewis, who were good friends, had learned during the course of the week that each of them was involved in a competing group which wanted to buy the property at 92-100 Massachusetts Avenue. Pratt told Lewis on the afternoon of August 6 that Holmes was considering buying Chamberlayne's right of first refusal and repeated to Lewis and Banker on Friday morning, August 7, that Holmes was still thinking about buying the premises. Pratt was negotiating a deal with Lewis throughout the afternoon of August 6, at the very time Lewis' partner, Banker, reached an agreement with Owen Todd to acquire Chamberlayne's rights and secured Todd's agreement to cease negotiations with Holmes and Pratt. Pratt, Lewis, Banker and Finnegan met at Finnegan's office on the morning of August 7, at 9:30 or 10:00 a.m., at the very time Christoforo was expecting Banker's group to come to Hale & Dorr to sign the agreement earlier reached in oral form to purchase Chamberlayne's right of first refusal. At that meeting at Finnegan's office, an oral agreement was reached for the Banker group to purchase Holmes' rights under its Purchase and Sale Agreement with Massbury for the sum of $15,000.00. This agreement was thereafter signed at the offices of Goodwin, Procter & Hoar on the afternoon of August 7.

"Neither Banker, Lewis nor Finnegan ever told Christoforo on Friday, August 7, that the Kensington Group was negotiating directly with Holmes, or that Kensington was purchasing Holmes' rights under its Purchase and Sale Agreement and was no longer interested in acquiring Chamberlayne's right of first refusal. Instead, Banker kept telling Christoforo throughout the day that he was waiting for Belkin to arrive from Cape Cod and would be coming to Hale & Dorr to execute the transaction shortly. At all relevant times, Belkin was on Cape Cod on vacation. August 8, 1981 was Belkin's tenth wedding anniversary, and he was, in fact, never asked to come up from Cape Cod for an August 7, 1981 meeting at Finnegan's offices.

"On Monday, August 10, 1981, Todd called Finnegan and told him he was very upset at the way Christoforo had been treated by Banker and by Finnegan in giving Christoforo the runaround on the previous Friday and in not meeting to execute the documents, and that Todd intended to hold Banker and his group to the Agreement with Chamberlayne to purchase the right of first refusal. Finnegan asked for an opportunity to speak with Banker to find out what the story was, and said he would call back. He did not tell Todd during this conversation that the Banker group was not going through with the deal to purchase Chamberlayne's right of first refusal. That same day, August 10, Todd wrote a letter to Banker in care of Finnegan, confirming the Agreement between Chamberlayne and Kensington and Chamberlayne's intention to hold Banker to the Agreement. On Tuesday, August 11, and Wednesday, August 12, Todd attempted to contact

Finnegan by telephone without success. Late on Wednesday, August 12, Finnegan finally called Todd and told him that the Kensington Group was not going ahead with its agreement with Chamberlayne, but was dealing with Holmes."

After making the foregoing findings, the judge concluded, inter alia, (1) that the defendants had by August 6, 1981, entered into an oral agreement that the defendants would pay Chamberlayne $60,000 for its right of first refusal to purchase under the lease, (2) that part of the agreement required counsel for Chamberlayne to cease negotiating with anyone else, (3) that the defendants engaged in stalling and deceptive tactics to prevent Chamberlayne from dealing with others, (4) that Chamberlayne reasonably relied to its detriment on the defendants' representations that they would reduce the agreement to writing, and (5) that the defendants negotiated secretly and wilfully made fraudulent misrepresentations. These actions, the judge determined, placed Chamberlayne in the position of not being able to take any legal advantage of its right of first refusal either in negotiating with a third party or in exercising it for its own use.

We see no error in these conclusions or in the ruling that the defendants' actions, which the jury found to constitute misrepresentation (deceit), were in violation of G. L. c. 93A. It was open to the judge to determine that the defendants' "conduct . . . was within 'at least the penumbra of some common-law, statutory, or other established concept of unfairness.'" *Zayre Corp.* v. *Computer Sys. of America, Inc.*, 24 Mass. App. Ct. 559, 570 (1987), quoting from *Levings* v. *Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 503-504 (1979). See also *Datacomm Interface, Inc.* v. *Computerworld, Inc.*, 396 Mass. 760, 779 (1986).

The defendants claim that the judge erred in substituting his own findings on damages for those of the jury. As noted earlier, the jury had found damages for misrepresentation in the amount of $20,000, but the judge found damages for the

c. 93A violation (a more expansive concept) to be $60,000.[3] He doubled that amount and awarded attorney's fees.

There is no right to a trial by jury for actions under G. L. c. 93A. *Nei v. Burley*, 388 Mass. 307, 315 (1983). Where a case includes both a common law claim (e.g., as here, misrepresentation) and a claim under c. 93A, a judge has the option of "[a] letting the jury find the facts for both claims, [b] reserving to himself all aspects of the c. 93A claim, or [c] asking the jury for a non-binding advisory" as to the c. 93A matter. *Acushnet Fed. Credit Union v. Roderick*, 26 Mass. App. Ct. 604, 606 (1988), and cases cited. *International Totalizing Sys., Inc. v. PepsiCo, Inc.*, 29 Mass. App. Ct. 424, 435-436 (1990). See *Computer Sys. Engr., Inc. v. Qantel Corp.*, 571 F. Supp. 1365, 1377-1378 (D. Mass. 1983), aff'd, 740 F.2d 59, 66-67 (1st Cir. 1984). While in the foregoing cases the judge's findings with respect to the c. 93A claim were in accord with those of the jury, in *Wallace Motor Sales, Inc. v. American Motors Sales Corp.*, 780 F.2d 1049, 1063-1067 (1st Cir. 1985), the United States Court of Appeals for the First Circuit upheld a judge's decision on the c. 93A claims directly contrary to the findings of the jury on the issues submitted to them. See also *Turner v. Johnson & Johnson*, 809 F.2d 90, 102 (1st Cir. 1986).

Although consistency and principles analogous to issue preclusion[4] have a surface appeal, we think the broader scope and more flexible guidelines of c. 93A, see *Nei v. Burley*, 388 Mass. at 313, permit a judge to make his or her own deci-

---

[3]The trial judge in his ruling suggested that he did not consider the jury's findings to fall within the zone of "reasonableness" as dictated by the evidence. Since the evidence of Banker's agreement to purchase Holmes' rights for $15,000 provides some support for the jury's verdict, our affirmance is not based on the judge's suggestion.

[4]The defendants do not argue that they are entitled to prevail on grounds of, or principles analogous to, issue preclusion. They refer, however, to Judge Keeton's comment in *Computer Sys. Engr., Inc. v. Qantel Corp.*, 571 F. Supp. at 1378, that there is an unseemliness in awarding damages on different counts in the same case "for amounts that differ only because two independent factfinders have arrived at different results, on evidence that supports either result."

sions under c. 93A without being constrained by the jury's findings.

The defendants' additional claim that the damages were not causally related to their actions is without merit. The judge could well award benefit of the bargain damages based on the findings that part of the agreement was that Chamberlayne cease to negotiate with others, that the defendants did not intend to go through with the agreement and engaged in deceptive stalling tactics to mislead Chamberlayne, and that, as a result, Chamberlayne could not take advantage of its first refusal rights. See *Rokowsky* v. *Gordon*, 531 F. Supp. 435, 438-439 (D. Mass. 1982), aff'd, 705 F.2d 439 (1st Cir.), cert. denied, 462 U.S. 1120 (1983), where, applying Massachusetts law, the court awarded benefit of the bargain damages in an action for deceit where real estate was withdrawn from the market due to the defendants' misrepresentations. See also *York* v. *Sullivan*, 369 Mass. 157, 165 (1975), indicating that an appropriate measure of damages in deceit cases, e.g., benefit of the bargain, is also appropriate in a c. 93A case. The judge's finding that the defendants' actions were wilful, which led to an award of double damages, is beyond cavil.

*Judgment affirmed.*