February 17, 1993
United States Court of Appeals
For the First Circuit

No. 92-1052

THE PH GROUP LTD., F/K/A,
COGNETICS EUROPE LTD,

Plaintiff, Appellant,

v.

DAVID L. BIRCH, ET AL.,

Defendants, Appellees.

No. 92-1053

THE PH GROUP LTD., F/K/A
COGNETICS EUROPE, LTD.,

Plaintiff, Appellee,

v.

DAVID L. BIRCH,

Defendant, Appellee,

COGNETICS, INC.

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. W. Arthur Garrity, Jr., Senior U.S. District Judge]

Before

Breyer, Chief Judge,

Brown,* Senior Circuit Judge,

Stahl, Circuit Judge.

Edwin A. McCabe with whom Joseph P. Davis, III, Karen Chinn

Lyons, and The McCabe Group were on brief for appellants.

Robert J. Kaler with whom Gadsby & Hannah was on brief for

appellees.

February 17, 1993

*Of the Fifth Circuit, sitting by designation.

STAHL, Circuit Judge. This case involves a failed

attempt to license American-made computer software for use in

Europe. On appeal, plaintiff The pH Group Ltd., formerly

known as Cognetics Europe Ltd. ("PH"), challenges the

district court's failure (1) to award it attorneys' fees and

(2) to rule favorably on its claims of unfair and deceptive

trade practices. Defendants Cognetics, Inc. ("Cognetics")

and David L. Birch cross-appeal, taking issue with the

district court's denial of their motion for judgment n.o.v.

or a new trial on their counterclaims for breach of

contract.1 Finding no error in the district court's

rulings, we affirm.

I.

FACTUAL BACKGROUND AND PRIOR PROCEEDINGS

David Birch developed computer software which

analyzes Dun & Bradstreet data bases for business consulting

purposes.2 In order to exploit this software in the United

States, Birch and his associates formed Cognetics. PH was

formed by Rolf Hickmann, Norbert Reis, and other individuals

principally to develop a consulting business in Europe

through the use of the Cognetics software. PH and Cognetics

1. Because the interests of Birch and Cognetics are
inexorably intertwined for purposes of this appeal,
references to Cognetics should be construed as applying
equally to Birch.

2. Dun & Bradstreet generates computer data bases which
report the financial statistics of private businesses.

-2-
2

negotiated a license agreement ("the Agreement"), under which

PH received the right to use the Cognetics name and software

in Europe. For its part, Cognetics was to provide PH with

both Dun & Bradstreet's European data bases and the Cognetics

software to analyze them. The parties agreed that

Massachusetts law would govern the Agreement's construction.

The Agreement was signed in January of 1987, and PH

began doing business in Europe. Shortly thereafter, the same

individuals who had formed PH incorporated Maven Systems,

Ltd. ("Maven").3 The record reflects that Maven was formed

to allow the individual owners of PH to pursue consulting

business in Europe without using the Cognetics software. The

Agreement clearly contemplates and allows for such outside

activity.4

Almost immediately, difficulties between the

parties surfaced. Essentially, PH claimed that Dun &

Bradstreet's European data bases differed from its American

data bases, and that Birch and Cognetics knew, or should have

3. Maven is not a party to this appeal. Cognetics named
Maven as a defendant-in-counterclaim below, but does not
appeal the district court's ruling that Maven is not liable
on the counterclaims.

4. Section 2(e) of the Agreement, entitled "Other
Businesses," states:

[N]othing shall preclude [PH] from conducting a
business unrelated to [Cognetics] Software, Related
Software or Products . . . provided that such
business is not conducted under the [Cognetics]
Name or any variation thereof.

-3-
3

known, that as a result of these differences the European

data bases could not be analyzed effectively with Cognetics

software. Cognetics, on the other hand, claimed that PH had

violated the Agreement by improperly allowing Maven to use

the Cognetics name in Maven's initial business dealings. By

September 1987, each party was claiming that it had

terminated the Agreement.

On April 22, 1988, PH sued Cognetics in diversity,

alleging common law fraud, breach of contract, negligence,

breach of an implied covenant of good faith and fair dealing,

breach of an implied warranty of fitness for a particular

purpose, and violation of Mass. Gen. Laws Ann. ch. 93A, 2

and 11 (West 1984 and Supp. 1992) (hereinafter referred to

collectively as "ch. 93A"), which proscribe unfair and

deceptive trade practices. PH sought $10 million in damages

on these claims. The complaint also asked for a declaratory

judgment that the Agreement's non-competition clause did not

preclude PH from pursuing its now established European

consulting business.5

Cognetics counterclaimed, alleging breach of

contract, misappropriation of trade secrets, unfair

5. PH also sought to recover $30,000, a "fixed fee" to be
paid to Cognetics for certain services due PH under the
Agreement. PH had placed this money into an escrow account
when its relations with Cognetics began to sour, and it began
to question whether Cognetics would provide the "fixed fee"
services. Cognetics never contested PH's entitlement to the
$30,000, and the district court awarded the funds to PH.

-4-
4

competition, violation of the Lanham Trade-Mark Act, 15

U.S.C.A. 1125(a) (West Supp. 1992), violation of Mass. Gen.

Laws Ann. ch. 110B, 12 (West 1990), which forbids trademark

infringement, and violation of ch. 93A, 11. Cognetics also

sought injunctive relief to prevent further use of its name

and proprietary materials.

The district court bifurcated the trial and tried

all liability issues first. After directing verdicts against

several of the parties' substantive claims, the court

submitted the following claims to the jury: (1) PH's claims

for fraud, breach of contract, and breach of implied covenant

of good faith and fair dealing; and (2) Cognetics' claims for

misappropriation of trade secrets, and breach of contract.

The claims and counterclaims under ch. 93A were tried to the

court along with the requests for declaratory and injunctive

relief.

The jury found against PH on all of its claims

except for the claim of breach of an implied covenant of good

faith and fair dealing. In the subsequent damages phase of

the trial, notwithstanding the favorable verdict, the jury

awarded PH zero damages on this claim. The jury found

against Cognetics on all of its counterclaims. The district

court found no violations of ch. 93A by either party and

denied all requests for declaratory and injunctive relief.

Finally, the court denied Cognetics' motion for judgment

-5-
5

n.o.v. or new trial, and denied PH's motion for attorneys'

fees.

II.

DISCUSSION

A. PH's Appeal

1. PH's Claim for Attorneys' Fees

PH argues that it is entitled to attorneys' fees

under section 21 of the Agreement6 because it "prevailed" on

its covenant of good faith and fair dealing claim.7 As an

initial matter, we note that the parties dispute whether this

issue was properly preserved for appeal. Assuming without

deciding that the issue was preserved, we find unpersuasive

PH's contention that it was a "prevailing party" below.

6. Section 21 of the Agreement states:

Attorneys' Fees. In any litigation, arbitration or

court proceeding between the parties, the
prevailing party shall be entitled to all costs of
the proceedings incurred in enforcing this
Agreement.

7. At oral argument, PH seemed to argue that the uncontested
award of the $30,000 in escrow entitled it to prevailing
party status. This argument, however, appears nowhere in the
trial record, nor does it appear in PH's appellate brief. It
is settled in this circuit that issues adverted to on appeal
in a perfunctory manner are deemed to have been abandoned.
United States v. St. Cyr, 977 F.2d 698, 701 (1st Cir. 1992).

As a result, we need not address this argument.

-6-
6

Courts, both in Massachusetts and elsewhere, have

uniformly required that a party succeed on a significant

issue in order to be entitled to attorneys' fees. See, e.g.,

Handy v. Penal Insts. Comm'r of Boston, 592 N.E.2d 1303, 1307

(Mass. 1992) (requiring that party in civil rights case

"succeed[] on a significant issue" to be entitled to

attorneys' fees); Fedele v. School Comm. of Westwood, 587

N.E.2d 757, 761 (Mass. 1992) (same). See also Farrar v.

Hobby, 113 S. Ct. 566, 569 (1992) (holding that "[w]hen a

[civil rights] plaintiff recovers only nominal damages

because of his failure to prove an essential element of his

claim for monetary relief, the only reasonable [attorneys']

fee is usually no fee at all." (citation omitted)); Texas

State Teachers Ass'n v. Garland Indep. Sch. Dist., 489 U.S.

782, 792 (1989) (holding that civil rights plaintiff seeking

attorneys' fees "must be able to point to a resolution of the

dispute which changes the legal relationship between itself

and the defendant. Beyond this absolute limitation, a

technical victory may be so insignificant . . . as to be

insufficient to support prevailing party status."); Guglietti

v. Secretary of Health and Human Servs., 900 F.2d 397, 399

(1st Cir. 1990) (requiring either "bottom-line litigatory

success" or "catalytic effect in bringing about a desired

result" for social security plaintiff to be entitled to

attorneys' fees). Moreover, outside of the civil rights

-7-
7

context, an award of zero damages, supported by a rational

basis in the record, is generally considered a judgment for

defendant. See, e.g., Ruiz-Rodriguez v. Colberg-Comas, 882

F.2d 15, 17 (1st Cir. 1989) (stating that award of zero

damages is "commonly viewed as, in effect, a judgment for

defendant"); Poulin Corp. v. Chrysler Corp., 861 F.2d 5, 7

(1st Cir. 1988) (holding that, upon award of zero damages,

"plaintiff has failed to establish an essential part of its

proof, and judgment should have been entered for

defendant."). Cf. Farrar, 113 S. Ct. at 573-74 ("Of itself,

`the moral satisfaction [that] results from any favorable

statement of law' cannot bestow prevailing party status. . .

. No material alteration of the legal relationship between

the parties occurs until the plaintiff becomes entitled to

enforce a judgment, consent decree or settlement against the

defendant.") (quoting Hewitt v. Helms, 482 U.S. 755, 762

(1986). The thrust of this authority renders unpersuasive

PH's argument that the district court erred in finding that

it was not a "prevailing party" under section 21 of the

Agreement.

Moreover, PH has not proffered any evidence of the

parties' intent in drafting section 21 of the Agreement. Nor

has it argued, let alone demonstrated, that any construction

other than the ordinary construction of the term "prevailing

party" should apply. Accordingly, we find no error in the

-8-
8

district court's holding that PH was not a "prevailing party"

for purposes of section 21 of the Agreement.

2. PH's ch. 93A Claim

PH also argues that the district court's ruling

that Cognetics did not violate ch. 93A is inconsistent as a

matter of law with the jury's verdict that Cognetics breached

the Agreement's implied covenant of good faith and fair

dealing. Massachusetts courts have held, however, that a

trial court's ruling on a ch. 93A claim may differ from a

jury's verdict on common law claims involving the same

evidence. Chamberlayne Sch. v. Banker, 568 N.E.2d 642, 648-

49 (Mass. App. Ct. 1991) ("Although consistency . . . ha[s] a

surface appeal, we think the broader scope and more flexible

guidelines of ch. 93A permit a judge to make his or her own

decisions under [ch.] 93A without being constrained by the

jury's findings."). See also Turner v. Johnson & Johnson,

809 F.2d 90, 102 (1st Cir. 1987) (interpreting Mass. law)

(holding that jury's determination is not binding on court's

ch. 93A decision); Wallace Motor Sales, Inc. v. American

Motor Sales Corp., 780 F.2d 1049, 1063-67 (1st Cir. 1985)

(interpreting Mass. law) (finding no reversible error where

district court denied judgment n.o.v. on jury counts,

reviewed same evidence, and reached conclusion contrary to

jury's verdict on the ch. 93A claim). Moreover, violations

of ch. 93A must meet a higher standard of liability than do

-9-
9

breaches of an implied covenant of good faith and fair

dealing. Compare Anthony's Pier Four, Inc. v. HBC

Associates, 583 N.E.2d 806, 820-22 (Mass. 1991) ("[t]he

implied covenant of good faith and fair dealing provides that

neither party shall do anything that will have the effect of

destroying or injuring the right of the other party to

receive the fruits of the contract . . . .'") (quoting Druker

v. Roland Wm. Jutras Assocs., Inc., 348 N.E.2d 763, 765

(Mass. 1976)) with Tagliente v. Himmer, 949 F.2d 1, 7 (1st

Cir. 1991) (stating that under ch. 93A, "`[t]he objectionable

conduct must attain a level of rascality that would raise an

eyebrow of someone inured to the rough and tumble of the

world of commerce.'" (quoting Quaker State Oil Refining Corp.

v. Garrity Oil Co., Inc., 884 F.2d 1510, 1513 (1st Cir.

1989)). As such, PH's claim that the verdicts were legally

inconsistent is without merit.8

B. Cognetics' Cross-Appeal

Cognetics appeals the district court's denial of

its motion for judgment n.o.v. or new trial on its breach of

contract claim. We must sustain the district court's denial

8. Although it is not clear from its briefs, PH appears to
argue that the district court (a) failed to make findings of
fact sufficient to support its ch. 93A ruling and/or (b)
inappropriately relied upon the jury's finding that Cognetics
committed no fraud. Having carefully reviewed the record, we
find that the district court's factual findings were both
comprehensive and independent of the jury's fraud verdict.
Thus, PH's contentions to the contrary are entirely
meritless.

-10-
10

of a motion for judgment n.o.v. unless the evidence, together

with all reasonable inferences in favor of the verdict, could

lead a reasonable person to only one conclusion, namely, that

the moving party was entitled to judgment. Luson Int'l

Distribs., Inc. v. Fabricating and Prod. Mach., Inc., 966

F.2d 9, 10-11 (1st Cir. 1992). On the other hand, we review

denial of a motion for new trial under an abuse of discretion

standard, with a view toward whether "`the verdict was so

clearly against the weight of the evidence as to amount to a

manifest miscarriage of justice.'" Pontarelli v. Stone, 930

F.2d 104, 113 (1st Cir. 1991) (quoting Hendricks & Assocs.,

Inc. v. Daewoo Corp., 923 F.2d 209, 217 (1st Cir. 1991)).

Cognetics presented uncontroverted evidence at

trial that the Cognetics name appeared on two separate Maven

products. On the first occasion, the Cognetics name appeared

in a Maven slide presentation at the bottom of every page.

On the second occasion, it appeared on the first and last

pages of a 43-page Maven presentation. On both occasions,

the Maven products were produced without the use of Cognetics

software.9 Cognetics argues that this evidence can only

9. Cognetics cites a third and different use of the
Cognetics name in arguing that section 2(b) was breached. On
this third occasion, PH used the Cognetics name in a product
proposal, but the final product used neither the Cognetics
name or software. We fail to see how such evidence relates
to sublicensing. PH's use of the Cognetics name in product
proposals is clearly contemplated by the Agreement. More
importantly, this third example presents no evidence that
Maven, or any other alleged "sublicensee," actually used the

-11-
11

lead to one conclusion, namely, that PH breached section

2(b),10 the Agreement's sublicensing provision. We

disagree.

In determining whether a breach of the Agreement's

sublicensing provision has occurred, we must first define the

terms "licensing" and "sublicensing" as they are used in the

Agreement. We consider the terms "in light of all the other

phraseology in the instrument," and "in light of the

circumstances of the transaction." McDonald's Corp. v. Lebow

Realty Trust, 888 F.2d 912, 913-14 (1st Cir. 1989) (citations

omitted).

Cognetics name or software. PH's use of the Cognetics name
in this situation might support a claim that PH breached
section 11(e) of the Agreement, which states that neither PH
nor its affiliates may market products which compete with
Cognetics products. However, this evidence does not support
Cognetics' claim that PH improperly sublicensed its rights
under the Agreement.

10. Section 2(b) provides:

Sublicense Right. Cognetics grants to [PH] the
right to sublicense its rights under Section 2(a)
to an entity or entities which are wholly owned by
[PH], provided however, that (i) [PH] notifies
Cognetics in advance and in writing with respect to
such sub-license, (ii) the foregoing right shall
not relieve [PH] from its obligations hereunder,
and (iii) such sub-licensee is subject to all of
the terms and conditions of this Agreement.
Cognetics may, in advance of such sub-license,
require any reasonable documentation of [PH] and
its sub-licensee in order to assure sub-licensee's
agreement to the foregoing.

-12-
12

As we read section 2(a)11 of the Agreement,

licensing consists of three elements: (1) an agreement; (2)

which permits the licensee to use the Cognetics name in

tandem with the Cognetics software; (3) in an ongoing

commercial manner. These three characteristics ensure that

PH, the licensee, can establish a viable consulting business

in Europe through the use of the Cognetics name and software.

Section 2(b), in turn, grants PH the right to

"sublicense" its rights under the Agreement to wholly owned

third parties. Sublicensing under 2(b) is similar to

licensing under 2(a). It consists of: (1) an agreement; (2)

whereby PH grants a third party permission to use the

Cognetics name in tandem with the Cognetics software; (3) for

ongoing commercial purposes.

11. Section 2(a) provides:

Software and Name License. Cognetics hereby grants

to Licensee the exclusive, non-transferable right
and license without right of sublicense, except as
specifically provided in subsection (b) hereof,
(the "License"), to (i) use the Object Code version
of the [Cognetics] Software and any Related
Software, including but not limited to any
Improvements, and all Software Documentation, (ii)
use and to commercialize the Name, including but
not limited to as part of the Name under which
Licensee does business in the European Market,
provided, however, that use of the Name shall be
solely in respect of [Cognetics] Products and (iii)
use, market, sell and otherwise to commercialize
the Products, provided however, that all the
foregoing is granted throughout but solely within
the European Market.

-13-
13

In order to prove a breach of section 2(b),

Cognetics would first have to establish the existence of a

sublicensing agreement between PH and Maven. Cognetics would

then have to show that the sublicensing was improper under

section 2(b) or some other provision of the Agreement.

Cognetics has failed to allege or demonstrate that any such

sublicensing occurred.

Both at trial and on appeal, Cognetics seems to

rely on the mistaken assumption that any misuse of the

Cognetics name by Maven or PH, whether intentional or

inadvertent, conclusively demonstrates improper sublicensing

in breach of section 2(b) on the part of PH. However, not

all misuses of the Cognetics name by non-sublicensed third

parties amount to breaches of section 2(b). General misuses

of the Cognetics name may be actionable under several of the

Agreement's provisions.12 However, in order to give rise

to a claim under section 2(b), the misuse must take place in

the context of an improper sublicensing agreement.

At trial, PH's principals testified that Maven's

misuse was essentially inadvertent. For example, Rolf

12. For example, section 6(c) states that PH acquires no
proprietary interest in the Cognetics name; section 11 states
that both parties agree to preserve the confidentiality of
proprietary material; section 14 states that PH will notify
Cognetics of any infringements of the Agreement by third
parties; and section 16 states that PH may not assign its
rights or obligations under the contract without Cognetics'
consent.

-14-
14

Hickmann, a principal of both PH and Maven, testified that

the use of the Cognetics name in Maven's slide presentation

was "careless," and that, between them, PH and Maven "could

only afford one set of stationery for slide material."

Cognetics offered no contrary evidence showing that the

misuses of the Cognetics name were in fact due to an improper

sublicensing agreement.

At best, Cognetics has demonstrated that PH and/or

Maven misused the Cognetics name on two occasions. Standing

alone, this evidence of misuse does not conclusively show

that PH improperly sublicensed its rights to Maven, or that

PH breached section 2(b) of the Agreement. Thus, contrary to

Cognetics' claim in its post-trial motion, the evidence does

not lead inexorably to the conclusion that PH improperly

sublicensed its rights to Maven in breach of section 2(b) of

the Agreement. A reasonable jury could have concluded that

Maven's misuse of the Cognetics name was inadvertent. In

fact, we find no evidence in the record which would allow a

jury to conclude otherwise. Accordingly, the district court

properly denied Cognetics' motion for judgment n.o.v.

By the same token, the verdict is not clearly

against the weight of the evidence and presents no manifest

-15-
15

miscarriage of justice. Thus, the district court committed

no error in denying Cognetics' motion for new trial.13

For the foregoing reasons, the judgment of the

district court is affirmed.

13. Cognetics also challenges the district court's
instructions to the jury on section 2(b). The district court
instructed the jury that only "material" breaches of section
2(b) give rise to a right to terminate the Agreement.
Cognetics argues that under the Agreement, non-material
breaches of section 2(b) also give rise to a right to
terminate, and that the district court's failure to so
instruct entitles it to judgment n.o.v. or a new trial.
We assume without deciding that non-material breaches of
section 2(b) give rise to a right to terminate. Nonetheless,
as we have noted above, Cognetics failed to allege or
demonstrate a breach of section 2(b), material or otherwise.
Thus, even if the district court's instruction on section
2(b) was incorrect, the evidence does not necessarily lead to
the conclusion that a non-material breach of 2(b) occurred.
Nor can we say that the verdict was so clearly against the
weight of the evidence as to amount to a manifest miscarriage
of justice. Accordingly, Cognetics' argument regarding jury
instructions does not alter our determination that the
district court properly denied Cognetics' motion for judgment
n.o.v. or new trial.

-16-
16