McHugh, J.
This is an action in which plaintiff, a minor child, seeks to recover damages for lead paint poisoning she claims to have incurred as a consequence of defendants’ failure to comply with G.L.c. 111, §§190 et seq., a statute regulating lead paint levels in buildings inhabited by small children. The case was tried to a jury on all claims save those filed by plaintiff under G.L.c. 93A. The latter were reserved for decision by the court, without a juiy, on the basis of the evidence presented to the jury and on the basis of the slight supplemental evidence presented in a post-trial hearing. See generally Chamberlain School & Chamberlain Junior College v. Banker, 30 Mass.App.Ct. 346, 354-55 (1991).[1]
On the basis of the evidence presented during the course of the jury trial and in the post-trial hearing, as well as the reasonable inferences I have drawn from that evidence, I make the following findings of fact[2] and conclusions of law:
FINDINGS OF FACT
Carmen Capone and his brother, Marcelo Capone (“the Capones”), owned and controlled a four-unit rental property at 263-65 Broadway in Sommerville, Massachusetts from 1987 until at least November of 1993. They themselves did not live there; they simply owned the properly, controlled it and rented it to others.
In November of 1990, the Capones leased an apartment at 263 Broadway to Lelis and Emma Alfaro, plaintiff Brenda Alfaro’s parents. Brenda was then about two and a half years old. Thereafter, Brenda lived in the apartment with her family until she was admitted to the Cambridge Hospital on May 10, 1991.
I find and conclude that at all times while the Alfaros were living in the apartment before May 10, 1991, the apartment contained dangerous levels of lead-based paint. In many places within the apartment, lead concentrations were greater than 1.2 milligrams of lead per square centimeter of surface as measured on site by a mobile X-ray analyzer. See 105 C.M.R. 460.020. The dangerous concentrations oflead paint were accessible to children, were on chewable, mouthable surfaces, were on flaking paint in window sills and were on exterior surfaces of windows less than five feet from the floor which came in contact with moveable surfaces.
Shortly before leasing the apartment to the Alfaro family, the Capones extensively renovated the building and its apartments. That renovation did not include removal of lead paint covering the walls and the window sills. To be sure, in some cases the Capones or workers they had hired chipped and scraped away some of the lead paint before the surfaces were painted with a non-lead paint. That chipping and scraping amounted to normal surface preparation, not fo-cussed deleading. In other cases, the lead paint was simply painted over.
In 1990, Carmen Capone worked as a professional realtor, having obtained his real estate license in or around 1987. He knew of his obligation to comply with the lead-paint law embodied in G.L.c. 111, §§190 et seq. From the earliest days of the Alfaro tenancy, both Carmen and Marcello Capone knew that children under the age of six were living in the Alfaro apartment. Neither of the Capones, however, knew in fact that the surfaces of the apartment were covered with lead paint.[3] I am not persuaded on this record, that the circumstances surrounding their acquisition, maintenance or renovation of the apartment were such that they should have known that lead paint was present.
In any event, young Brenda Alfaro ingested lead paint in the apartment and that lead paint poisoned her. When tested by pinprick in April 1991, she had a blood lead level of 24 pg/dl. Because that test was not sufficient to make a definitive diagnosis oflead poisoning, she was retested on May 7, 1991, through the medium of a venous sample. The venous sample revealed a lead level of 41 |rg/dl. Both levels are generally considered to be “elevated.” Almost all professionals commence treatment when the latter level is observed and confirmed.
Brenda was admitted to Cambridge Hospital on May 10, 1991 for evaluation and treatment of lead poisoning. She thereafter began what is known as *582 chelation therapy. A blood sample taken the day she was admitted revealed that she then had a blood lead level of 56 gg/dl.[4] X-rays taken at the hospital on her admission also revealed the presence of lead paint chips in her stomach.[5]
Brenda received “chelation therapy” throughout her five-day stay in the Cambridge Hospital. She also underwent repeated enemas from May 10, 1991 through May 12, 1991 to remove lead paint chips from her digestive system. That treatment was warranted by the condition the physicians observed and the reports they received and was carried out in a manner consistent with good and accepted medical practice at the time.[6]
Chelation therapy is an invasive and painful treatment utilized to reduce the body’s lead levels. The procedure involves injecting chemicals into a child’s blood stream through intravenous needles. The procedure has the potential side effect of kidney damage and is considered to be a dangerous medical procedure, undertaken only when the child is at serious risk of permanent injury from lead ingestion. During her hospitalization, young Brenda incurred not only the pain of the chelation therapy but also the anxiety, apprehension and fright that a young child necessarily would experience when thrust into a bewildering environment filled with strange people, needles, tubes and hurtful procedures.
At or near the time of Brenda’s hospitalization, several inspections of the Alfaro apartment revealed the presence of dangerous levels of lead paint. The inspectors communicated their findings to the Capones. As a consequence, the Capones removed the lead paint in proper fashion. Upon her return to the apartment after discharge from the hospital, Brenda was not exposed to additional lead in the apartment and her blood lead levels never increased thereafter.
Little persuasive information was presented by any of the experts called to testify on the long-term impact of Brenda’s exposure to lead paint. What little persuasive evidence was presented is insufficient to persuade me that, more likely than not, Brenda suffered any permanent brain damage as a result of her ingestion of lead. Far more persuasive was the testimony of her able, talented and dedicated teachers in the Somerville school system. I am persuaded by that testimony that Brenda is a child with considerable strengths and considerable weaknesses who seems to have done far better scholastically when placed in a bilingual environment where Spanish speakers helped her when her developing English was insufficient to allow her to deal effectively with the day’s lessons.[7]
On or about September 6,1991, more than one year before the action commenced, counsel for Brenda sent a demand letter to the Capones under G.L.c. 93A. The Capones and their insurers received that letter.
CONCLUSIONS OF LAW
On the basis of the foregoing findings of fact, I conclude that defendants violated G.L.c. 93A, §2 by renting apartment No. 2 at 263 Broadway to the Alfaro family, a family that included a two-year old child, when that apartment contained levels of lead paint in excess of those permitted by G.L.c. 111, §§190 et seq. I make that finding because, and solely because, the attorney general’s regulations promulgated pursuant to G.L.c. 93A, §2, expressly provide that it is an unfair and deceptive act or practice for an owner of residential real estate to “(r]ent a dwelling unit which, at the inception of the tenancy, contains a condition which amounts to a violation of law which may endanger or materially impair the health, safety or well-being of the occupant.” 940 C.M.R. 3.17(1)(a)(1). See generally, Montanez v. Bagg, 24 Mass.App.Ct. 954, 955-56 (1987). The Capones’ failure to remove the lead paint on the surfaces described above when they rented the apartment to the Alfaros was a violation of law. G.L.c. 111, § 197(a). The presence of lead paint in impermissible levels at the inception of the Alfaros’ tenancy thus “amounted to” a violation of law for purposes of 940 C.M.R. 3.17(1)(a)(1).[8]
I conclude that the damages suffered by Brenda Alfaro as a consequence of the Capones’ violation, of chapter 93A, taking into account Brenda’s hospitalization, her fright, her anxiety and her physical pain and suffering, amount to $18,000.00.
I further conclude that the defendants’ violation of G.L.c. 93A was not knowing and was not willful. I have found that they did not know that the apartment was covered with lead paint and I am not persuaded either that they negligently failed to discover that fact or that they willfully ignored the possibility that lead was there. Rental of the apartment unit to the Alfaros under those circumstances was therefore not a knowing or willful violation of chapter 93A.
Finally, I conclude that plaintiffs demand letter sent before the action commenced fully complied with the requirements of G.L.c. 93A, §9 and described with adequate precision both the basis for Brenda’s liability claim against the Capones and the alleged injury she suffered. See generally Cassano v. Gogos, 20 Mass.App.Ct. 348, 350-52 (1985). An effective and proper demand letter need not contain an encyclopedic description of the basis for liability or damages. A plain and straightforward description of both is perfectly adequate. The letter in this case met that standard.
ORDER
In light of the foregoing, this Court shall hold its final hearing on October 11, 1994 at 8:45 a.m. in Salem to assess the reasonableness of the defendants’ offer of settlement under G.L.c. 93A and that offer’s effect, if any, on the award of damages to which plaintiff is otherwise entitled. At that time the court will also hear plaintiffs claim for costs and attorneys *583 fees. Attorneys fees shall be calculated in light of what the court found and did not find and in accordance with the principles addressed, inter alia, in Fontaine v. Eptic Corp., 415 Mass. 309, 324-26 (1993).

 The jury returned a verdict on a series of special questions, finding, in essence, that defendants violated the lead paint statute but that their violation caused plaintiff no damage.

 I make those findings on sometimes sharply conflicting evidence that could warrant findings to the contrary.

 On the present record, I am not persuaded that either of the Capones knowingly, willfully or purposely declined to determine whether or not the surfaces were covered with lead paint. Compare Whelihan v. Markowski, 37 Mass.App.Ct. 209 (1994).

 The results of that sample were not available until several days after Brenda’s admission. Nevertheless, the tests performed on the sample measured the level of lead in her blood when she was admitted.

 In so finding, I recognized that other explanations for the objects the radiologists observed on the X-ray films are possible. I am persuaded, however, that more likely than not, the films revealed the presence of lead paint chips.

 More precisely, the manner in which Brenda’s condition was diagnosed and the treatment that was administered were consistent with the care and treatment that would be rendered by the average qualified practitioner treating lead poisoning in the spring of 1990 taking into account the advances in the profession. Brune v. Belinkoff, 354 Mass. 102, 109 (1968).

 Counsel for plaintiff contend that, as a result of her lead ingestion, Brenda suffered permanent brain damage that would adversely affect her developmental capabilities throughout her life. In an effort to prove and disprove that thesis, both sides engaged expert witnesses who appeared to have been selected chiefly for their general point of view on the general subject of lead’s impact on small children. Once engaged, the experts spared no effort in attempting to shoehorn all empirical and theorized data about Brenda into their preexisting view of what lead was or was not likely to do. It is difficult to imagine an approach less likely to yield the truth or even a reliable marker to the path where truth probably lies.

 Neither the Capones’ knowledge of lead paint’s presence in dangerous levels nor their negligent failure to learn of the lead’s presence is a necessary precondition to liability under the lead paint law itself. Benscome v. Kokoros, 400 Mass. 40, 43 (1987). Given the clear and unequivocal language of the Attorney General’s regulation, I conclude that neither knowledge nor negligence is a necessary predicate for liability under G.L.c. 93A.