SPECIALIZED TECHNOLOGY RESOURCES, INC. *vs.* JPS
ELASTOMERICS CORP. & another.[1]

No. 11-P-776.

Hampshire. September 6, 2011. - November 23, 2011.

Present: KAFKER, GREEN, & GRAINGER, JJ.

*Contract,* Performance and breach. *Trade Secret. Consumer Protection Act,*
Trade secret, Unfair act or practice, Attorney's fees. *Practice, Civil,* Find-
ings by judge, Consumer protection case, Injunctive relief, Attorney's fees.
*Damages,* Wrongful use of trade secret. *Injunction.*

In a civil action in which claims of breach of contract and misappropriation of
trade secrets were tried to a jury and a claim of a violation of G. L. c. 93A,
§ 11, was heard by the judge, the jury's conclusion that the defendants had
not misappropriated the plaintiff's trade secrets did not preclude a contrary
conclusion by the judge on the c. 93A claim. [844-846] GRAINGER, J.,
concurring.

In a civil action, the former employer-employee relationship between the
plaintiff and an individual defendant did not bar the plaintiff's claim
against the individual defendant and his current employer for misap-
propriation of trade secrets amounting to an unfair and deceptive act or
practice in violation of G. L. c. 93A, § 11. [846-847]

In a civil action claiming misappropriation of trade secrets amounting to an
unfair and deceptive act or practice in violation of G. L. c. 93A, § 11, the
judge did not err or abuse her discretion in imposing a permanent injunc-
tion against use of the plaintiff's trade secret; further, the judge was justi-
fied in enjoining the defendants from producing the product at issue for a
period equivalent to the time the plaintiff spent in development of its trade
secret method, and the judge did not abuse her discretion in ordering the
defendants to dismantle the assembly line built to manufacture that product
using the plaintiff's trade secret process. [847-849]

There was no merit to the defendants' contentions that in a civil action, the
plaintiff did not establish any loss or damages resulting from the defend-
ants' misappropriation of the plaintiff's trade secret in violation of G. L.
c. 93A, § 11, and that the judge improperly calculated an award of attor-
ney's fees. [849-851]

CIVIL ACTION commenced in the Superior Court Department on
October 2, 2007.

The case was tried before *Constance M. Sweeney, J.*

[1]James P. Galica.

*John C. Englander* (*Henry C. Dinger* with him) for the defendants.

*Bruce S. Meyer* (*Patrick J. O'Toole, Jr.*, with him) for the plaintiff.

GREEN, J. During the 1990s, the plaintiff, Specialized Technology Resources, Inc. (STR), developed an innovative method to produce a specialized encapsulant used in making solar cells. The defendant James P. Galica oversaw the project team within STR that developed the method. Galica left STR in June, 2005, and joined the defendant JPS Elastomerics Corp. (JPS) in September, 2006. Within a year after Galica joined JPS, it began marketing and producing an encapsulant product using a method substantially identical to the one developed by STR. STR commenced this action in the Superior Court, claiming, inter alia, breach of contract, misappropriation of trade secrets, and violation of G. L. c. 93A, § 11. The common-law claims were tried to a jury, while the trial judge reserved the G. L. c. 93A (c. 93A) claim to herself. In response to special verdict questions, the jury found that the method developed by STR is a trade secret, but that Galica and JPS did not misappropriate it.[2] However, the judge concluded, on the same evidence, that Galica and JPS misappropriated the trade secret and that such misappropriation constituted an unfair and deceptive act or practice within the meaning of c. 93A. She directed entry of judgment awarding $1,075,556 in damages (which she trebled as authorized by the statute) and granting injunctive relief. She also awarded $3,902,595 in attorney's fees and $1,108,731 in costs.

In their appeal, the defendants claim a myriad of errors. They challenge the propriety of the finding of liability under c. 93A, asserting that the judge was without authority to make findings contrary to those of the jury, and that in any event no liability under c. 93A can lie because STR's claims arise out of its employer-employee relationship with Galica. They further contend that the scope of the injunction is overbroad, even if the defendants may be held liable under c. 93A. We have reviewed the several lengthy and thorough written memoranda of decision entered by the trial judge, and carefully considered

---

[2]The jury likewise found that Galica did not breach his confidentiality agreement with STR.

the various arguments advanced by the parties. Our review persuades us that the defendants have shown no cause to disturb the judgment, and we affirm it.

*Background.* We briefly summarize the findings of fact recited by the trial judge in her memorandum of decision in which she found the defendants liable on the c. 93A claim.[3]

STR manufactures plastic sheeting materials used to encapsulate solar cells, extruded from ethylene vinyl acetate (EVA). STR holds approximately twenty-five percent of the global market for EVA, due in significant measure to its development of "low shrink" EVA,[4] which prevents premature deterioration of encapsulated solar cells exposed to the elements. STR developed its method for producing low shrink EVA following an intensive five-year research and design effort that began in late 1990. The lead project engineer on the team that developed STR's method for producing low shrink EVA was Robert Yorgensen, who is now STR's president. The defendant Galica was director of STR's materials science division during the time STR developed its method to produce low shrink EVA, and in that capacity was the executive responsible for overseeing the development process.

Early in his efforts to develop a method to produce low shrink EVA, Yorgensen developed a hypothesis about what caused EVA to shrink. In a series of experiments thereafter, Yorgensen tested his hypothesis and found it to be correct. He then set about devising a method to modify the manufacturing process in order to reduce or avoid the influence of factors causing shrinkage.[5] Galica thereafter conducted several experiments to verify Yorgensen's results. As a result of the successful efforts

---

[3]Though, as observed in the introduction, the defendants contend that the trial judge was without authority to make findings contrary to those made by the jury on the common-law counts, the defendants do not argue that the judge's findings are clearly erroneous.

[4]The judge found that EVA produced by conventional means typically experienced a shrinkage rate of forty percent, and defined "low shrink" EVA as EVA with a shrinkage rate of less than forty percent. The low shrink EVA produced by STR has a shrinkage rate of less than one percent.

[5]The details of the manufacturing process are largely inconsequential to the issues presented in this appeal. We intentionally omit detailed description in order to avoid unnecessary exposure of STR's discoveries.

of the project team, STR began manufacturing and selling low shrink EVA by the end of 1996.

As observed in the introduction, Galica left STR in June, 2005, and joined JPS in September, 2006. Within a year thereafter, JPS began marketing and producing low shrink EVA using a method substantially identical to the one developed by STR, and STR commenced this action. A Superior Court jury concluded that STR's method for producing low shrink EVA constituted a trade secret, but that JPS and Galica did not misappropriate the trade secret. However, the trial judge (who had reserved STR's c. 93A claim for determination) concluded that JPS and Galica had misappropriated STR's trade secret, and that such misappropriation violated c. 93A. She awarded damages, injunctive relief, and attorney's fees. This appeal followed. We address the defendants' various claims of error in turn.

*Effect of jury verdict on judge's determination of c. 93A claim.* In posttrial briefs submitted to the trial judge, and on appeal, the defendants contend that the jury's conclusion (expressed in their response to special verdict questions) that the defendants did not misappropriate STR's trade secret precludes a contrary conclusion by the trial judge. The defendants acknowledge that there is no right to a jury trial on a c. 93A claim, and that many Massachusetts cases have held that a jury's verdict on related common-law claims is not binding on a judge who has reserved determination of a c. 93A claim to herself. See, e.g., *Poly* v. *Moylan*, 423 Mass. 141, 151 (1996), cert. denied, 519 U.S. 1114 (1997); *Kattar* v. *Demoulas*, 433 Mass. 1, 12-13 (2000); *Chamberlayne Sch. & Chamberlayne Jr. College* v. *Banker*, 30 Mass. App. Ct. 346, 354-355 (1991); *Wyler* v. *Bonnell Motors, Inc.*, 35 Mass. App. Ct. 563, 567 (1993); *Velleca* v. *Uniroyal Tire Co.*, 36 Mass. App. Ct. 247, 251 (1994); *Bank of America, N.A.* v. *Prestige Imports, Inc.*, 75 Mass. App. Ct. 741, 769 (2009). See also *Wallace Motor Sales, Inc.* v. *American Motors Sales Corp.*, 780 F.2d 1049, 1063-1067 (1st Cir. 1985). See generally Gilleran, Law of Chapter 93A § 12.21 (2d ed. 2007), and cases cited. The defendants nonetheless contend that such cases are not controlling, since (they assert) no decision of the Supreme Judicial Court has squarely held that a trial judge is free to decide questions of fact on a c. 93A claim in a manner

directly contrary to the findings of a jury on common-law claims tried as part of the same action, and since the decisions of the Appeals Court cited by the trial judge are distinguishable.[6] The defendants further contend that their position is compelled by the reasoning of the Supreme Judicial Court in *Dalis* v. *Buyer Advertising, Inc.*, 418 Mass. 220, 227-228 (1994), derived in turn from the reasoning of the United States Supreme Court in *Beacon Theatres, Inc.* v. *Westover*, 359 U.S. 500 (1959). We are unpersuaded.

As a threshold matter, we observe that the defendants waived at trial the argument they now press. The defendants specifically requested in their pretrial memorandum that the trial judge reserve STR's c. 93A claim to herself. The defendants' present contention that their request merely attached to the trial judge's determination of the c. 93A claim itself, but did not anticipate that the judge would weigh and determine factual questions contrary to the jury's findings, is belied by the argument they advanced in support of their motion for a directed verdict, in which they observed that "c. 93A authorizes the Court to make independent findings of fact, which will not be overturned on appeal as an impermissible 'inconsistent judgment' even if those findings are contrary to the jury's findings." Only after the jury returned their verdict in the defendants' favor did they reverse course and argue to the trial judge that she was bound by the jury's responses to special verdict questions.[7]

In any event, the defendants' argument finds no support in Massachusetts law, and the defendants' efforts to distinguish or explain away the rich body of precedent supporting a trial judge's authority to enter findings inconsistent with those of the jury are ultimately unavailing.[8] Though many cases that have discussed the issue do not involve the precise circumstances

---

[6] The defendants acknowledge that Appeals Court cases other than those cited by the trial judge suggest that a judge may enter findings on a c. 93A claim contrary to those made by a jury, but asserts that statements to that effect in such other cases are merely dicta.

[7] In her memorandum of decision, the trial judge expressed her view that the defendants had waived the argument, but went on to address — and reject — the argument on its merits.

[8] The jury responded "no" to the following special verdict question: "Has STR proven by a preponderance of the evidence that defendant James P.

here (in which a jury responded to special verdict questions), in at least one case we have upheld a judge's contrary conclusion in precisely such circumstances. See *Velleca* v. *Uniroyal Tire Co.*, 36 Mass. App. Ct. at 251. Though the judge in that case found no liability under c. 93A despite a jury's finding for the plaintiff on a breach of warranty claim (in contrast to the posture of the present case in which the judge found liability under c. 93A despite a jury's finding for the defendants on the related common-law claims), the trial judge in *Velleca* made specific factual findings, essential to his conclusion on the question of causation, that were directly contrary to the jury's answers to special verdict questions, and our opinion specifically upheld his authority to do so in response to an appellant's argument to the contrary. *Ibid.* We do not understand the defendants to argue that a judge who has reserved a c. 93A claim is bound by a jury's factual findings only if they favor the defendant rather than the plaintiff, but that is the only ground on which *Velleca* may be distinguished.[9]

*Applicability of c. 93A.* The defendants separately assert that c. 93A is inapplicable to STR's claim in the present case, as it arises out of an employer-employee relationship between STR and Galica. See *Manning* v. *Zuckerman*, 388 Mass. 8, 12-15 (1983); *Informix, Inc.* v. *Rennell*, 41 Mass. App. Ct. 161, 163

---

Galica misappropriated STR's trade secret?" The jury also answered "no" to a substantially identical question concerning JPS. We note that, to the extent that the question whether the defendants misappropriated STR's trade secret presents a mixed question of fact and law, the judge's conclusion might not constitute a contrary finding purely of fact.

[9]The defendants' reliance on *Dalis* v. *Buyer Advertising Inc.*, 418 Mass. at 224-228, is likewise unavailing. *Dalis* did not consider whether a jury's findings of fact are binding on a judge for purposes of determining claims to which no jury right attached; instead, it simply determined whether certain statutory causes of action gave rise to the right to a jury trial. See *ibid.* Indeed, in the process of its analysis, the Supreme Judicial Court specifically distinguished c. 93A and reiterated that plaintiffs asserting a claim under that statute are not entitled to a jury trial. *Id.* at 225.

We note that the defendants did not present their *Dalis*-based argument to the trial judge, and articulate it for the first time on appeal. Indeed, in their supplemental brief submitted to the trial judge on the issue (following oral argument on the c. 93A claim), the defendants argued instead that *Nei* v. *Burley*, 388 Mass. 307, 315 (1983), was wrongly decided, and that denial of a jury trial on the c. 93A claim violated their rights under arts. 12 and 15 of the Massachusetts Declaration of Rights.

(1996). However, JPS was never an employee of STR. See *Augat, Inc.* v. *Aegis, Inc.* 409 Mass. 165, 172 (1991); *S.C.*, 417 Mass. 484 (1994); *Peggy Lawton Kitchens, Inc.* v. *Hogan*, 18 Mass. App. Ct. 937, 940 (1984). More to the point, though Galica obtained the trade secret during his employment with STR and was bound by a confidentiality agreement as part of his employment contract, his misappropriation of the trade secret was actionable independent of his contractual obligations and accordingly may support a claim under c. 93A. See *Peggy Lawton Kitchens, Inc.* v. *Hogan*, *supra*; *Informix, Inc.* v. *Rennell*, *supra* at 163 n.2.[10] The former employer-employee relationship between STR and Galica does not stand as a bar to STR's c. 93A claim against either Galica or JPS.

*Scope of injunctive relief.* As originally entered, the injunctive order directed JPS to refrain from use of the particular manufacturing process developed by STR that constituted the trade secret, but allowed it to continue producing EVA by what JPS represented were "conventional means." However, by order entered on January 27, 2011, following an evidentiary hearing directed to the appropriate scope of the injunction, the judge modified the injunction to prohibit production of low shrink EVA by any means for a period of five years (the injunction against use of STR's trade secret method is permanent). JPS contends that the scope of the injunction is overbroad, because it contends that its production of EVA using what it describes as "method 3"[11] does not utilize STR's trade secret but instead relies solely on methods residing in the public domain. JPS separately contends that the evidence did not warrant entry of a

[10]The defendants contend that STR's claim for misappropriation of trade secrets necessarily arises from the employer-employee relationship between STR and Galica, since *Jet Spray Cooler, Inc.* v. *Crampton*, 361 Mass. 835, 839 (1972), held that an employee's obligation not to disclose confidential information is based on "an implied contract, growing out of the nature of the employer-employee relation." However, both *Peggy Lawton Kitchens, Inc.* v. *Hogan*, *supra*, and *Informix, Inc* v. *Rennell*, *supra*, which were decided well after *Jet Spray Cooler*, recognized a claim for misappropriation of trade secrets as independently actionable, notwithstanding the former employer-employee relationship (and whatever role it might have played in giving rise to the claim).

[11]Our discussion of JPS's argument does not require us to describe the details of the manufacturing process JPS refers to as "method 3."

permanent injunction against use of STR's trade secret process itself.

We review the terms of the injunction imposed by the trial judge for abuse of discretion. Cf. *Demoulas* v. *Demoulas Super Mkts., Inc.,* 424 Mass. 501, 543 n.48 (1997). "The scope of an injunction depends on a comparative appraisal of all of the facts of the case, and what is reasonable will depend in each instance on the particular facts." *Jillian's Billiard Club of America, Inc.* v. *Beloff Billiards, Inc.,* 35 Mass. App. Ct. 372, 376 (1993). See generally Restatement (Third) of Unfair Competition § 44(2) (1995). A permanent injunction against use of a trade secret manufacturing process "is not unreasonable merely because it is permanent." *Curtiss-Wright Corp.* v. *Edel-Brown Tool & Die Co.,* 381 Mass. 1, 10 (1980), quoting from *Analogic Corp.* v. *Data Translation, Inc.,* 371 Mass. 643, 647 (1976). In fashioning the duration of an injunction against use of a trade secret manufacturing process, the Supreme Judicial Court has held that the amount of time necessary to reverse engineer the technology without improper use of trade secrets is relevant to determining the scope of any injunctive relief. See *Analogic Corp.* v. *Data Translation, Inc., supra* at 647-649. However, the trial judge in the present case specifically found that the low shrink EVA product is not susceptible of "reverse engineering," and her finding in that regard finds support in the record. See *Curtiss-Wright Corp.* v. *Edel-Brown Tool & Die Co., supra* at 11. The judge likewise found that STR's trade secret has not entered the public domain. We discern no error or abuse of discretion in the imposition of a permanent injunction against use of STR's trade secret.

As to the five-year production injunction, the trial judge considered the process described by JPS as "method 3" to be derived inextricably from the proprietary information Galica acquired from STR. The judge's assessment had a basis in the evidence. Prior to Galica's employment by JPS, JPS did not manufacture or produce EVA by any means. Prior to development of its trade secret method, STR produced EVA by conventional methods, but the resulting product did not have low shrink characteristics. The trial judge found that, under Galica's supervision, JPS was able to modify its production processes in

a manner that utilized Yorgensen's discovery about the causes of shrinkage, but which employed adjustments to the production sequences different from those incorporated in the particular method that constituted STR's trade secret method. Because the method developed by JPS derived from specialized knowledge brought by Galica from STR to JPS, and particularly because the evidence suggested that JPS would not have been able to develop such a method independently, the judge's order enjoining JPS from production of low shrink EVA by any means for a period of five years (a period equivalent to the time STR spent in development of its trade secret method) was justified.[12] See *Eastern Marble Prod. Corp.* v. *Roman Marble, Inc.,* 372 Mass. 835, 839-840 (1977); *USM Corp.* v. *Marson Fastener Corp.,* 392 Mass. 334, 351-352 (1984).[13]

There is likewise no merit to the defendants' contention that the judge erred in ordering JPS to dismantle the assembly line it built to manufacture low shrink EVA using STR's trade secret process. The judge found that the assembly line was "essentially a replication of [STR's] protected manufacturing process. It was designed, engineered and put into use as a direct result of the defendants' theft of [STR's] trade secret." The judge's finding was not clearly erroneous, and her directive that JPS dismantle the line was not an abuse of her considerable discretion, nor was her rejection of JPS's proposal in the alternative simply to remove certain specialized equipment from the line.[14]

*Other issues.* There is no merit to the defendants' contention

---

[12]JPS of course remains free to produce EVA that is not low shrink, whether by means of "method 3" or by any other means than those encompassed within STR's trade secret method.

[13]JPS protests the imposition of an injunction against production of low shrink EVA by any means, since STR is not the sole current producer of low shrink EVA. Compare *Eastern Marble Prod. Corp.* v. *Roman Marble, Inc.,* supra; *Curtiss-Wright Corp.* v. *Edel-Brown Tool & Die Co.,* 381 Mass. at 11; and *Peggy Lawton Kitchens, Inc.* v. *Hogan,* 18 Mass. App. Ct. at 938. However, the judge found that only three other manufacturers (and possibly a fourth) currently produce low shrink EVA, and that the manufacturing processes used by the other manufacturers are not currently in the public domain. The judge's findings in that regard are not clearly erroneous.

[14]In rejecting JPS's proposal merely to alter the line, the judge expressed concern that the configuration of the line, even after such alteration, could risk exposure of STR's trade secret process. We do not consider the judge's concern to be entirely without foundation, but in any event we observe that

that the award of damages must be reversed because STR did not establish any loss or damage resulting from the defendants' misappropriation of STR's trade secret. As STR observes (and the defendants acknowledge), in cases involving the misappropriation of trade secrets "[t]he plaintiff is entitled to the profit he would have made had his secret not been unlawfully used, but not less than the monetary gain which the defendant reaped from his improper acts." *Jet Spray Cooler, Inc.* v. *Crampton*, 377 Mass. 159, 170 (1979), quoting from 2 Callman, Unfair Competition, Trademarks and Monopolies § 59.3 at 496 (3d ed. 1968). See Restatement (Third) of Unfair Competition § 45 comment f ("The plaintiff is entitled to recover the defendant's net profits"). The defendants' argument appears to rely on a contention that STR has not established the requisite monetary harm to support a claim under c. 93A. See *Hershenow* v. *Enterprise Rent-A-Car Co. of Boston, Inc.*, 445 Mass. 790, 800-802 (2006); *Tech Plus, Inc.* v. *Ansel*, 59 Mass. App. Ct. 12, 20-21 (2003). To the contrary, though (as often occurs in a case involving trade secret misappropriation) the precise scope of STR's monetary loss is difficult to quantify, the record supports the judge's implicit conclusion that STR, which enjoyed a twenty-five percent global market share in a highly specialized product, suffered a loss of sales when it suddenly faced competition from another producer in its own backyard based on improper use of STR's trade secret manufacturing process. Having satisfied the requirement that it demonstrate *some* monetary loss, the use of disgorgement of profits to compensate STR for the defendants' misuse of the trade secret was entirely appropriate.[15] See *Jet Spray Cooler, Inc.* v. *Crampton*, 377 Mass. at 170-171.

There is likewise no merit to the defendants' contention that the judge improperly calculated the attorney's fees attributable to STR's c. 93A claim (as distinct from those attributable to the common-law claims). As the judge observed, the issues related to the c. 93A claims were inextricably interrelated with the common-law claims. See *Castricone* v. *Mical*, 74 Mass. App.

the judge was not required to adopt JPS's proposed remedy even were we to assume it would achieve the objective of protecting STR's trade secret while imposing a lesser burden on JPS.

[15]JPS does not contend that the judge incorrectly computed the profits it gained from use of the trade secret.

Ct. 591, 604 (2009). The judge carefully reviewed the invoices for services and deducted amounts associated exclusively with the jury aspects of the trial (such as impanelment). There was no error.

STR has requested an award of the attorney's fees and costs it incurred on appeal. Pursuant to c. 93A, it is entitled to such an award. See *Yorke Mgmt.* v. *Castro*, 406 Mass. 17, 19 (1989). STR shall, within fourteen days following the date of the rescript, file with this court and serve on the defendants a motion for determination of the amount of its attorney's fees and costs incurred on appeal, supported by an affidavit detailing such amounts, in accordance with the procedure described in *Fabre* v. *Walton*, 441 Mass. 9, 10-11 (2004). The defendants may, within fourteen days thereafter, file with this court and serve on STR an opposition to the amount of fees so claimed.

*Judgment affirmed.*


GRAINGER, J. (concurring). I concur in the careful analysis and result reached by the majority. I write separately to observe that this case presents an example of the potential for mischief when a statute combines a laudable goal with an entirely subjective standard.

Our result today is required by case law with language explicitly endorsing inconsistent findings based on identical evidence. See *Kattar* v. *Demoulas*, 433 Mass. 1, 12-13 (2000). As the defendants point out, however, this case differs from all that have preceded it because the result cannot be rationalized in a legal context, as where common-law damages are increased by statutory liability, cf. *Chamberlayne Sch. & Chamberlayne Jr. College* v. *Banker*, 30 Mass. App. Ct. 346, 353-355 (1991), or where a common-law claim is found to exist but no liability is assigned under G. L. c. 93A, cf. *Guity* v. *Commerce Ins. Co.*, 36 Mass. App. Ct. 339, 340-341 (1994) (affirming judgment where jury found for plaintiff on breach of contract claim and judge found for defendant concerning c. 93A).

As the defendants also point out, if these claims had been brought sequentially, a determination that trade secrets had, or

had not, been stolen would enjoy the protection of collateral estoppel on the second attempt. Under this statutory construct, however, a court can freely engage in cognitive dissonance, otherwise prohibited, simply by issuing contradictory findings simultaneously. As has been observed in another context, this poses "a query of the type that intrigues the legal mind but is a source of bafflement and some impatience to the average layman." *United States* v. *Trzcinski,* 553 F.2d 851, 852 (3d Cir. 1976), cert. denied, 431 U.S. 919 (1977).

General Laws c. 93A has been amended substantively on thirty-six occasions since it was first enacted in 1967. The subjective nature of "unfairness" renders the infliction of penalty, or the avoidance of accountability, especially susceptible to the perception of the individual fact finder. Not unlike the case where allegedly unfair conduct inflicts no damages, see, e.g., *Hershenow* v. *Enterprise Rent-A-Car Co. of Boston, Inc.,* 445 Mass. 790, 801 (2006), this aspect of the statute, where different fact finders examine the same evidence, would benefit from re-examination.